UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
OLASUPO OGUNMOKUN,

               Plaintiff,

      - against -

AMERICAN EDUCATION
SERVICES/PHEAA and XPRESS LOAN
SERVICING a.k.a. CIT GROUP,

               Defendants.
------------------------------------------------------------X

**MEMORANDUM AND ORDER**
12-CV-4403 (RRM) (JO)

ROSLYNN R. MAUSKOPF, United States District Judge.

    *Pro se* plaintiff Oasupo Ogunmokun ("Ogunmokun") brings this action against Xpress Loan Servicing ("XLS") a.k.a. CIT Group ("CIT"),[1] and American Education Services/PHEAA ("PHEAA"), relating to the allegedly fraudulent consolidation of Ogunmokun's student loans. Ogunmokun claims that defendants "aided and abetted" that fraud, committed common law conversion, engaged in the "fraudulent imposition of pecuniary loss," and violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681n, 1681o, and 1681s-2b. Before the Court are the motions of CIT (Doc. Nos. 78, 80) and PHEAA (Doc. Nos. 74, 76) to dismiss Ogunmokun's Fifth Amended Complaint (Doc. No. 71 ("FAC")) pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6). For the reasons stated below, PHEAA's motion to dismiss is GRANTED, and CIT's motion to dismiss is GRANTED in part, and the Court declines to exercise supplemental jurisdiction as to any remaining state law claims against CIT and/or XLS.

---

[1] As explained in the text *infra*, CIT is not, in fact, an alias for XLS. Rather, CIT was the corporate parent of subsidiary XLS.

**BACKGROUND**

**I.   Relevant Facts**[2]

On July 10, 2007, Ogunmokun met with Richard Preisig of University Student Services – a student-loan consolidation business – about a job opening as a loan consolidation agent. That same day, an employee of University Student Services interviewed Ogunmokun, and conducted what Ogunmokun understood, at the time, to be a training exercise for the prospective job.[3] The employee also walked Ogunmokun through the process of completing an application and promissory note for a consolidation loan under the Federal Family Education Loan Program ("FFELP").[4] As part of that exercise, Ogunmokun provided his personal information as well as details for student loans – with a principal balance totaling more than $50,000 – that he had previously acquired to finance his own college education. The employee assured Ogunmokun, though, that this was only a mock consolidation. Ogunmokun was subsequently offered the job and began working at University Student Services. (FAC at 5–6.)[5]

On August 4, 2007, Ogunmokun received a package in the mail from XLS, which identified itself as the lender for his newly-consolidated loan and requested payment.

---

[2] At this stage, the Court's review is limited to facts stated on the face of the complaint, facts found in documents incorporated by reference in the complaint or integral to the claims alleged, and matters of which the Court may take judicial notice. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). For the purposes of Rule 12(b) review, the Court takes all factual allegations in the complaint as true and draws all reasonable inferences in Ogunmokun's favor. *See Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009).

[3] Ogunmokun does not specify where that interview occurred.

[4] The FFELP is authorized under Title IV, Part B of the Higher Education Act ("HEA") of 1965, as amended, codified at 20 U.S.C. §§ 1071, *et seq.* (regulations at 34 C.F.R. Part 682). Under the FFELP, lenders use their own funds to make loans to qualified borrowers to facilitate the borrowers' attendance at eligible post-secondary schools. These loans are guaranteed by state agencies or private non-profit organizations, and are reinsured and often subsidized by the United States Department of Education. *See* 20 U.S.C. §§ 1078, 1087-1; *Shabtai v. U.S. Dep't of Educ.*, No. 02-CV-8437 (LAP), 2003 WL 21983025, at *1–2 (S.D.N.Y. Aug. 20, 2003).

[5] Ogunmokun did not paginate his Fifth Amended Complaint. Page numbers refer to the ECF pagination.

Ogunmokun immediately advised XLS by phone that he had not authorized the consolidation, he threatened to sue XLS, and he "contacted the authorities." Ogunmokun refused to acknowledge the consolidated loan or to make any payments toward the balance. (*Id.* at 6.)

In October 2007, XLS reported Ogunmokun's payment delinquencies to the three major credit reporting agencies – TransUnion, Experian, and Equifax. (*Id.*) In November 2007, using the "dispute" option on each of those agencies' respective websites, Ogunmokun notified the agencies that "a fraud had been perpetrated" against him. (*Id.*) The agencies, in turn, placed Ogunmokun's "credit profiles" on a "fraud alert" and notified the "companies involved," namely, XLS and the loan guaranty agency, PHEAA.[6] (*Id.*)

In early 2008, PHEAA took assignment of the defaulted loan from XLS.[7] Ogunmokun informed customer service personnel at PHEAA that he had been defrauded and insisted that he would not acknowledge the legitimacy of the consolidated loan. (*Id.*) In 2009, based on Ogunmokun's defaulted loan, the Internal Revenue Service ("IRS") confiscated $23 from his tax refund pursuant to the Treasury Offset Program.[8] (*Id.* at 7.)

---

[6] A guaranty agency is a "state or private nonprofit organization that has an agreement with the Secretary [of Education] under which it will administer a loan guarantee program under the [Higher Education] Act." 34 C.F.R. § 682.200. "PHEAA" stands for "Pennsylvania Higher Education Assistance Agency"; it is a state-created entity that does business under the title "American Education Services." As a loan guarantor, PHEAA routinely furnishes information to consumer reporting agencies as contemplated by the FCRA.

[7] The exact date when PHEAA took assignment of the defaulted loan is unclear. Ogunmokun states that PHEAA first introduced itself to him as the guarantor in February 2008. (FAC at ¶ L.) PHEAA, similarly, states that the loan entered default status "in 2008," whereupon XLS filed a claim on the loan guarantee. PHEAA paid the claim and then took assignment of the defaulted loan. (PHEAA's Mot. to Dism. at 4.)

In early 2008, collection on the defaulted loan was transferred to third-party debt collection agency NextStudent Loans ("NSL"), which phoned Ogunmokun repeatedly. (FAC at ¶¶ K–M, 6–7.) Ogunmokun felt harassed and reported NSL to the New York State Attorney General, but learned that he had no redress. (*Id.* at ¶ M.) Collection on the loan was later transferred to two additional third-party debt collection agencies: Diversified Collection Services ("Diversified") and Account Control Technology. (*Id.* at ¶¶ 43, 53.)

[8] The Treasury Offset Program is a centralized debt collection program, authorized pursuant to the Debt Collection Improvement Act, developed and run by the United States Department of Treasury to help federal agencies collect delinquent debts owed to the federal government. *See* 31 U.S.C. §§ 3716, *et seq*; *Shabtai*, 2003 WL 21983025, at *2.

3

During 2010, Ogunmokun contacted PHEAA multiple times and requested that it investigate the fraud committed against him. (*Id.* at 7–8.)

In 2011, the IRS confiscated Ogunmokun's tax refund. (*Id.*) Upon contacting the IRS, Ogunmokun learned that he could obtain relief from the treasury offset only by securing a court order. (*Id.* at 8.) At one point, PHEAA offered Ogunmokun an opportunity to file for "hardship," which might have afforded him additional flexibility in making payments. Ogunmokun declined to pursue that option because he viewed it as an admission of having initiated the consolidation. (*Id.*)

## II. Procedural History

On August 31, 2012, Ogunmokun filed a *pro se* complaint against five defendants: Rich Preisig/University Student Services ("Preisig/USS"), XLS, NSL, PHEAA, and the IRS. (Compl. (Doc. No. 1).) On September 19, 2012, Ogunmokun amended his complaint by adding Diversified as a defendant. (Am. Compl. (Doc. No. 5).) On March 20, 2013, on consent of the parties, Ogunmokun amended his complaint for the second time. In his Second Amended Complaint, Ogunmokun named CIT – the parent company of subsidiary XLS – as an alias for XLS. By this time, XLS had apparently ceased doing business and was defunct. Ogunmokun also dismissed NSL, Diversified, and the IRS from the lawsuit. Ogunmokun specified that Preisig/USS had committed fraud and conversion; that XLS had aided and abetted that fraud and conversion, and had willfully and falsely reported negative credit information; and that PHEAA, among other things, had "fraudulently imposed pecuniary loss" on Ogunmokun, and had willfully and falsely reported negative credit information. (Second Am. Compl. (Doc. No. 46).)

On March 27, 2013, Ogunmokun filed his Third Amended Complaint, attaching as exhibits paperwork relating to the consolidated loan. (Third Am. Compl. (Doc. No. 50).) On

4

April 26, 2013, Ogunmokun filed his Fourth Amended Complaint with additional exhibits. (Fourth Am. Compl. (Doc. Nos. 56–57).)[9]

On June 25, 2013, this Court dismissed Preisig/USS from the action based on Ogunmokun's failure to effect service of process, despite the Court having accorded him several extensions in which to do so. (Doc. No. 67.)

On July 15, 2013, Ogunmokun filed his Fifth Amended Complaint, which incorporated additional allegations pertaining to his veil-piercing theory of liability against CIT and constitutes the operative pleading. (Doc. No. 71.) The two remaining defendants in the lawsuit are "XLS aka CIT" and PHEAA. Defendants' motions to dismiss followed.

## III. The Parties' Positions

Ogunmokun neither disputes the validity of his underlying student loans nor asserts that CIT or PHEAA participated directly in the allegedly fraudulent consolidation of those loans. Rather, Ogunmokun contends that XLS "aided and abetted" that fraud by not investigating his claims of misconduct, and that CIT – as XLS's corporate parent – should be held financially responsible. (FAC at 2, 10–12.) Furthermore, Ogunmokun alleges that PHEAA committed

---

[9] On May 16, 2013, CIT notified the Court that it intended to move to dismiss on the ground that, despite Ogunmokun's contrary insistence, it could not be held responsible for XLS's alleged misconduct under a veil-piercing theory of corporate liability. (Doc. No. 59.) Ogunmokun, in response, moved for permission to engage in expedited discovery before any motion practice for the purpose of adducing details about the relationship between CIT and XLS. (Doc. No. 61.) Magistrate Judge James Orenstein ordered CIT to respond to Ogunmokun's request, and, on June 12, 2013, CIT submitted a letter opposing discovery and emphasizing, *inter alia*, that substantially all of the information sought by Ogunmokun was already publicly available because CIT was a publicly-traded company. (Doc. No. 62.) On June 24, 2013, the parties appeared before Judge Orenstein for a conference on Ogunmokun's motion. From the bench, Judge Orenstein denied Ogunmokun's request and stayed discovery pending resolution of CIT's anticipated motion to dismiss. Judge Orenstein also directed the parties to confer about potentially allowing Ogunmokun, in advance of CIT's dismissal motion, to amend the complaint so as to assert additional facts in support of his piercing-the-corporate-veil theory of liability against CIT. (Doc. No. 66.) Four days later, CIT advised the Court that it had entered into a stipulation with Ogunmokun in which CIT consented to Ogunmokun amending his complaint on the condition that this would be his final amendment with respect to CIT. (Doc. No. 68–69.) Soon thereafter, Ogunmokun filed his Fifth Amended Complaint, which, as noted, is the operative pleading. (Doc. No. 71.)

conversion by refusing to discharge his consolidated loan and pursuing collection efforts against him, and engaged in the "fraudulent imposition of pecuniary loss" by obtaining an IRS treasury offset. (*Id.* at 2–4.) Ogunmokun also maintains that each defendant violated the FCRA by inadequately investigating his claims of fraud. (*Id.* at 2–5.)

In moving to dismiss the complaint, CIT asserts, principally, that it cannot be held liable for the conduct of its now-defunct subsidiary XLS. (CIT's Mot. to Dism. (Doc. No. 78) at 6–10.) PHEAA, meanwhile, contends that Ogunmokun's lawsuit is premature because he failed to exhaust available administrative remedies, and that, in any event, his allegations fail to state a plausible basis for relief. (PHEAA's Mot. to Dism. (Doc. No. 74-1) at 7–14.)

## STANDARD OF REVIEW

In order to withstand a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint need not contain "'detailed factual allegations,'" but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (quoting *Twombly*, 550 U.S. at 555). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," which requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678–79.

"Although a *pro se* plaintiff must satisfy pleading requirements, the Court is 'obligated to construe a *pro se* complaint liberally.'" *Malachi v. Postgraduate Ctr. for Mental Health*, No. 10-CV-3527 (RRM), 2013 WL 782614, at *1 (E.D.N.Y. Mar. 1, 2013) (quoting *Harris*, 572 F.3d at 71–72). In other words, the Court holds *pro se* pleadings to a less exacting standard than

complaints drafted by attorneys, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and reads such pleadings to "raise the strongest arguments that they suggest." *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001) (citations omitted). Nevertheless, the Court "need not argue a *pro se* litigant's case nor create a case for the *pro se* which does not exist," *Molina v. New York*, 956 F. Supp. 257, 259 (E.D.N.Y. 1995), and "[w]hen a *pro se* plaintiff has altogether failed to satisfy a pleading requirement, the Court must dismiss the claim." *Malachi*, 2013 WL 782614, at *1 (citing *Rodriguez v. Weprin*, 116 F.3d 62, 65 (2d Cir. 1997)).

## DISCUSSION

**I.     Failure to Exhaust Administrative Remedies**

It is axiomatic that, when relief can be obtained in the first instance from an administrative agency, a person must exhaust that remedy before filing a lawsuit seeking that same relief. Failure to pursue an available administrative remedy typically renders a lawsuit premature and subject to dismissal. *See generally Reiter v. Cooper*, 507 U.S. 258, 269 (1993); *Beharry v. Ashcroft*, 329 F.3d 51, 56 (2d Cir. 2003); *Santos-Buch v. Financial Industry Regulatory Authority, Inc.*, No. 14-CV-651 (SAS), 2014 WL 3610810, at *3 (S.D.N.Y. July 8, 2014).

Under the Higher Education Act ("HEA"), which governs student loans guaranteed federally by the Department of Education, a borrower seeking certain types of loan relief must normally avail himself of the administrative process outlined in 34 C.F.R. § 682.402. *See, e.g.*, *Carlin v. CBE*, No. 08-CV-1491 (RRM), 2008 WL 2113255, at *1–2 (E.D.N.Y. May 19, 2008) (citing *Nehorai v. U.S. Dep't of Educ. Direct Loan*, No. 08-CV-920 (SLT), 2008 WL 1767072, at *1 (E.D.N.Y. Apr. 14, 2008)). The HEA does not permit a private right of action for student borrowers of such loans. *See Wimberly v. U.S. Dep't of Educ.*, 12-CV-7773 (JPO), 2013 WL

7

6123172, at *2 (S.D.N.Y. Nov. 21, 2013); *Nehorai*, 2008 WL 1767072, at *1; *Moy v. Adelphi Institute, Inc.*, 866 F. Supp. 696, 704 (E.D.N.Y. 1994).

As relevant here, a borrower seeking discharge of a student loan debt on the ground of identity theft must follow the procedure set forth in 34 C.F.R. § 682.402(e). The borrower must begin by submitting a written request and sworn statement to the holder of the promissory note certifying information concerning the identity theft. The borrower must also provide a copy of a verdict or judgment establishing that the borrower was, in fact, the victim of an identity-theft crime. The request and attendant materials are forwarded to the federally-backed guaranty agency – in this case, PHEAA – which determines whether the borrower qualifies for a discharge of the loan. If the guarantor denies the request for discharge, a borrower may appeal directly to the Secretary of Education. *See Nehorai*, 2008 WL 1767072, at *1; *see also* 34 C.F.R. § 682.402(e)(7)(iii)(B)(2). If dissatisfied with the decision of the Secretary of Education, only then would the borrower be entitled to file a claim for judicial review under the Administrative Procedure Act. *See* 5 U.S.C. §§ 701, *et seq.*; *De La Mota v. U.S. Dep't of Educ.*, 412 F.3d 71, 77 (2d Cir. 2005).

Here, Ogunmokun alleges that he was the victim of identity theft in the consolidation of his student loans. (*See, e.g.*, Pl.'s Resp. at 2 ("The fact remains that the Plaintiff did not consolidate his student loans in 2007, and was a victim of the crime of identity theft by his former employer").) And it appears that, at bottom, Ogunmokun seeks to have his debt discharged on this basis.[10] However, Ogunmokun has failed to comply with any aspect of the

---

[10] Ogunmokun also seeks damages and insists, at one point, that he is not asking the Court to discharge his student loan debt. (FAC at 9, 12.) Elsewhere, though, Ogunmokun argues that he should be excused from having to exhaust his available administrative remedies before bringing the instant lawsuit – implicitly suggesting that, as addressed in the text *infra*, he is indeed pursuing the discharge of his debt.

detailed regulatory procedure set forth above. In fact, he specifically acknowledges having never done so. (*See* FAC at 8–10.)[11]

Ogunmokun also complains because PHEAA filed a treasury offset against him with the IRS, and he demands to have that offset vacated. But Ogunmokun had an administrative remedy available to him on that score as well. Under 34 C.F.R. § 682.410(b), a defaulting borrower facing a treasury offset has the right, at any time, to an administrative hearing regarding the "existence, amount, or enforceability of the debt," or the "terms of the repayment schedule." 20 U.S.C. § 1095a(a)(5); 34 C.F.R. § 682.410(b)(9). A guaranty agency, such as PHEAA, must provide such a hearing "upon request." *Id.* As PHEAA underscores, "at any time, even today, Plaintiff could request a hearing, and PHEAA would be obligated under the Higher Education Act to provide it." (PHEAA's Mot. to Dism. at 13.) Ogunmokun does not allege that he ever availed himself of this remedy. *See Carlin*, 2008 WL 2113255, at *2; *Bowers v. Pennsylvania Higher Educ. Assistance Agency*, No. 10-CV-8675 (PKC), 2011 WL 3585986, at *5–6 (S.D.N.Y. July 29, 2011) (finding a failure to exhaust administrative remedies by not requesting a hearing under 34 C.F.R. § 682.410(b)).

Nonetheless, Ogunmokun argues that he should be excused from having to comply with the exhaustion requirement because this case is "extraordinary," in the sense that defendants have egregiously disregarded his rights. (FAC at 9.) But there is no exception to the administrative exhaustion requirement for "extraordinary" cases. Nor does Ogunmokun's situation satisfy any of the recognized exhaustion exceptions. In that regard, a plaintiff's failure to exhaust administrative remedies can be excused if "(1) the claim is collateral to a demand for benefits, (2) exhaustion would be futile, or (3) requiring exhaustion would result in irreparable

---

[11] Ogunmokun states only that he contacted the "authorities" upon learning that his loans were consolidated. (FAC at 6.) Yet he provides no details about the identity of those authorities, or whether there was ever a criminal investigation or prosecution of any kind.

harm." *Skubel v. Fuoroli*, 113 F.3d 330, 334 (2d Cir. 1997). None of those exceptions reasonably applies here. This is not a situation in which Ogunmokun's claim is collateral to a demand for benefits, as might be true in an action to recover, for instance, Social Security benefits. Nor has Ogunmokun shown that pursuing an administrative solution would be futile. Quite the contrary, Ogunmokun simply never bothered pursuing such a solution in the first place, and, even to this day, he could request an administrative hearing from PHEAA. Lastly, considering that Ogunmokun waited for five years after he was allegedly defrauded to file the instant lawsuit, this was hardly a time-sensitive matter that implicates imminent and irreparable harm. Ogunmokun, therefore, has not demonstrated that he should be excused from the exhaustion requirement.

Accordingly, insofar as Ogunmokun seeks to have his student-loan debt discharged, or to be relieved from the treasury offset against him, those claims are procedurally foreclosed based on his failure to exhaust available administrative remedies.

## II. Failure to Plead Wrongful Conduct against PHEAA[12]

Seemingly invoking New York common law, Ogunmokun contends that PHEAA committed "conversion" by failing to investigate his claims of fraud, and by instead taking steps to collect its debt on his defaulted loan. He further alleges that, by certifying him to the IRS's Treasury Offset Program, PHEAA engaged in the "fraudulent imposition of pecuniary loss." (FAC at 2–5.) Neither ground states a plausible basis for relief against PHEAA.

---

[12] Although a state-created entity, PHEAA does not move to dismiss on Eleventh Amendment sovereign immunity grounds. *See generally Pele v. Pennsylvania Higher Educ. Assist. Agency*, 2014 WL 1329409, at *8 (E.D. Va. Apr. 2, 2014) (finding that PHEAA, which invoked Eleventh Amendment immunity in moving to dismiss an FCRA claim, failed to meet its burden of demonstrating that it was an "arm of the state").

To begin, there is simply no cause of action for "fraudulent imposition of pecuniary loss" under New York law. Nor does common law conversion rationally apply to the facts at hand. "The two elements required for common-law conversion are (1) plaintiff's possessory right or interest in property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Yadav v. Rajeev*, 2014 WL 2218149 (S.D.N.Y. May 29, 2014) (quoting *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 50 (2006)) (internal quotations omitted). As a matter of common sense, Ogunmokun's allegations concerning PHEAA – which involve that organization's debt collection activity in relation to its role as guarantor of Ogunmokun's consolidated loan – have nothing to do with those legal elements.

Additionally, as PHEAA emphasizes, (PHEAA's Mot. to Dism. at 10–11), its debt collection activities are not only permissible, but affirmatively *required* by law pursuant to the FFELP regulations. For example, under 34 C.F.R. § 682.410(b)(6)(i), a "guaranty agency," such as PHEAA, "*must* engage in reasonable and documented collection activities on a loan on which it pays a default claim filed by a lender." 34 C.F.R. § 682.410(b)(6)(i) (emphasis supplied). And, for a "non-paying borrower" such as Ogunmokun, the agency "*must* perform at least one activity every 180 days to collect the debt . . . or determine if the borrower has the means to repay the debt." *Id.* (emphasis supplied). Likewise, PHEAA's certification of Ogunmokun to the IRS's Treasury Offset Program – which Ogunmokun characterizes as the "fraudulent imposition of pecuniary loss" – is specifically mandated by 34 C.F.R. § 682.410(b)(6)(v). According to that regulation, a guaranty agency "*must* attempt an annual Federal offset against all eligible borrowers." 34 C.F.R. § 682.410(b)(6)(v) (emphasis supplied).[13]

---

[13] Because it is clear that Ogunmokun does not plausibly allege a common law tortious cause of action against PHEAA, the Court need not reach PHEAA's fallback preemption argument. (*See* PHEAA's Mot. to Dism. at 9–11.)

As a separate matter, Ogunmokun fails to state a valid cause of action under the FCRA concerning PHEAA's alleged duty to investigate the fraudulent loan consolidation. Ogunmokun avers that, in November 2007, he notified the three major credit reporting agencies that he "disputed" the information about his default loan status provided to them by XLS. (*See* FAC at ¶¶ 65–66 (stating that Ogunmokun "challenged the negative reports with the three credit bureaus, citing fraud").) The credit agencies, in turn, placed "fraud alerts" on Ogunmokun's credit files – as evidenced by documentary exhibits, which Ogunmokun annexed to his complaint, reflecting that TransUnion, Experian, and Equifax instituted fraud alerts on his files between November 15 and 17, 2007. (FAC at 2–4; Doc. No. 57).) Ogunmokun alleges that the credit agencies then advised PHEAA of this information, (FAC at ¶ I), thereby triggering PHEAA's responsibility to investigate his fraud claims.[14] Additionally, Ogunmokun complains that, during 2008, 2010, and 2012, he repeatedly advised PHEAA of the alleged fraud, but that PHEAA refused to suspend its collection efforts or otherwise take steps to investigate. (*Id.* at ¶¶ L, P, S, V, W).) Ogunmokun claims that PHEAA, by not conducting such an investigation, violated its "professional duty to investigate" under the FCRA. (FAC at 5.)

In considering Ogunmokun's claim, the Court will begin by briefly outlining the applicable law. The FCRA was enacted "to require that consumer [*i.e.*, credit] reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer." 15 U.S.C. § 1681(b); *see Dickman v. Verizon Communications, Inc.*, 876 F. Supp.

---

[14] Based on Ogunmokun's documentary exhibits – specifically, letters from the credit reporting agencies to Ogunmokun – PHEAA suggests that Ogunmokun did not viably "dispute" any particular item on his credit reports such that, under the FCRA, the agencies would have been obligated to notify the furnisher of the information at issue. (PHEAA's Rply at 5 n.16.) For the purpose of the ensuing analysis in the text, the Court assumes that Ogunmokun validly lodged disputes regarding his consolidated loan. That is because, even giving Ogunmokun this benefit of the doubt, his allegations nonetheless fail to support an actionable claim for relief under the FCRA.

2d 166, 171 (E.D.N.Y. 2012). Upon a consumer advising a credit reporting agency that information in its credit files is disputed, the agency must notify the "furnisher" of that information regarding the dispute within five business days. 15 U.S.C. § 1681i(a)(1), (2).

The duties imposed on furnishers of information are set forth in 15 U.S.C. § 1681s-2(a) and (b). Subsection (a) establishes a furnisher's duty, in the first instance, to report accurate information, along with an ongoing duty to correct and update inaccurate information. 15 U.S.C. §1681s-2(a)(1)(A).[15] Subsection (b), which is relevant here, governs a furnisher's duties after receiving notice from a credit reporting agency regarding the disputed accuracy of credit information. "After receiving notice pursuant to [15 U.S.C. §] 1681i(a)(2) of a dispute with regard to the completeness or accuracy of any information provided by [the furnisher of information] to a consumer [*i.e.*, credit] reporting agency, the [furnisher of information] shall (A) conduct an investigation with respect to disputed information; (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title; (C) report the results of the investigation to the consumer reporting agency; [and] (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information." 15 U.S.C. § 1681s–2(b).

Under 15 U.S.C.§ 1681s-2(b), a furnisher of information to a credit reporting agency has "no duty to investigate [a] credit dispute unless [the furnisher] received notice of the dispute" from such an agency. *Prakash v. Homecomings Financial*, No. 05-CV-2895 (JFB), 2006 WL 2570900, at *3 (E.D.N.Y. Sept. 5, 2006); *see Shieh v. Flushing Branch, Chase Bank USA, N.A.*,

---

[15] Notably, there is no private right of action under subsection (a). Only appropriate federal or state authorities can sue to enforce that subsection of the FCRA. *See* 15 U.S.C. § 1681s-2(d); *Dickman*, 876 F. Supp. 2d at 172; *Elmore v. North Fork Bancorporation, Inc.*, 325 F. Supp. 2d 336, 339 (S.D.N.Y. 2004).

13

No. 11-CV-5505 (CBA), 2012 WL 2678932, at *7 (E.D.N.Y. July 6, 2012). "Notification from a consumer is not enough." *Kane v. Guaranty Residential Lending, Inc.*, No. 04-CV-4847 (ERK), 2005 WL 1153623, at *5 (E.D.N.Y. May 16, 2005). "Unless and until a furnisher of information . . . receives notice from a credit reporting agency, no private right of action exists under section 1681s-2(b)." *Id.*

Against this legal backdrop, Ogunmokun's pleadings fail to state a claim for relief. First, insofar as Ogunmokun posits that PHEAA violated the FCRA by not initiating an investigation in response to his *own* complaints directed at PHEAA, the law does not support an actionable claim under those circumstances. As just explained, "[u]nless and until a furnisher of information," such as PHEAA, "receives notice *from a credit reporting agency*, no private right of action exists under section 1681s-2(b)." *Kane*, 2005 WL 1153623, at *5 (emphasis supplied). Put another way, PHEAA was under no legal duty to investigate based solely on Ogunmokun's say-so. *See Elmore v. North Fork Bancorporation, Inc.*, 325 F. Supp. 2d 336, 340 (S.D.N.Y. 2004) ("If Congress had meant to create liability for violations once the furnisher had notice from any source of the existence of a dispute, it would have been a simple matter to say so. The fact that it nevertheless limited Section 1681s-2(b) is entitled to respect").

Of course, in November 2007, Ogunmokun also allegedly lodged disputes with the credit reporting agencies about information that XLS had provided to those agencies. Ogunmokun insists that the credit agencies then notified PHEAA of this dispute, which nonetheless failed to investigate. (FAC at ¶ I.) However, that proposition is simply not plausible. As PHEAA underscores, (PHEAA's Mot. to Dism. at 9 n.31), by Ogunmokun's own allegations, November 2007 predated PHEAA's earliest involvement in the loan process, which did not occur until months later in February 2008. (*See* FAC at 6 ("Plaintiff received notice from AES/PHEAA no

14

later than February 2008 (prior mailings are yet to be found) introducing itself as the guaranty agency").) No tenable basis exists, then, for Ogunmokun's allegation that the credit agencies advised PHEAA of any disputed information in November 2007.[16]

Ogunmokun's cause of action under the FCRA fails for another reason. An actionable failure-to-investigate claim would require that Ogunmokun disputed information that *PHEAA* provided to the credit reporting agencies. That is because a credit reporting agency is only obligated to give notice of a dispute to a person or entity that "provided any item of information in dispute." 15 U.S.C. § 1681i(a)(2). The credit reporting agencies, consequently, would not have notified PHEAA of a dispute relating to information provided to those agencies by a different person or entity, such as XLS. Here, importantly, Ogunmokun never alleges that he disputed information furnished to the credit reporting agencies by PHEAA. As described, Ogunmokun claims only that, in November 2007, he registered disputes with those agencies concerning information that XLS – *not* PHEAA – had tendered.[17] Under these circumstances, the agencies would not have advised PHEAA that Ogunmokun had disputed any information, and PHEAA simply could not have possessed any duty to investigate or verify such information.

In short, Ogunmokun's allegations fail to establish a colorable claim against PHEAA under the FCRA.

---

[16] According to Ogunmokun's exhibits, (Doc. No. 57), the "fraud alerts" on his credit report expired after ninety days, which would have been, at the latest, on February 15, 2008. Although this ninety-day window overlapped with PHEAA's initial involvement as the loan guarantor, there is no reasonable ground for finding that, for this reason, PHEAA would have received notification of any dispute from the credit reporting agencies. That is because, under the FCRA, a credit reporting agency must notify an information furnisher of a dispute within *five days* of receiving notice of the contested information. *See* 15 U.S.C. § 1681i(a)(2). The five-day period required by law for providing such notice thus lapsed well before PHEAA entered the loan process. Moreover, the fact that there was a continuing fraud alert would have made no difference, as those alerts merely signified that anyone who received a copy of Ogunmokun's credit report during the ninety days would be warned to take precautionary measures to verify the identity of the applicant before extending credit. (*See id.*) This certainly did not mean that the credit reporting agencies would have advised PHEAA of the underlying "dispute" that precipitated the fraud alerts.

[17] That makes sense. As already stated, because it appears, by all accounts, that the loan had not yet been assigned to PHEAA in November 2007, PHEAA's guaranty obligations were not yet triggered at that point in time.

### III. CIT's Liability for XLS's Alleged Misconduct

As against PHEAA, Ogunmokun claims that XLS, which is now defunct, violated the FCRA by failing to investigate his fraud claims. (FAC at 2–3.) Additionally, Ogunmokun contends that XLS "aided and abetted" Preisig/USS in defrauding him, ostensibly raising a cause of action under New York common law. (*Id.* at 2.) Ogunmokun makes no direct claims against CIT, which was XLS's corporate parent. But he does maintain that CIT should nonetheless be held responsible for its subsidiary's misconduct under an alter-ego theory of corporate liability, as well as under a handful of other legal doctrines. (*Id.* at 10–11.)

At the outset, the Court finds that Ogunmokun's FCRA claim against XLS and CIT is time-barred. As relevant here, the FCRA's statute of limitations is "the earlier of (1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or (2) 5 years after the date on which the violation that is the basis for such liability occurs." 15 U.S.C. § 1681p; *Caldwell v. Gutman, Mintz, Baker & Sonnenfeldt, P.C.*, 701 F. Supp. 2d 340, 354 (E.D.N.Y. 2010). Ogunmokun states that, upon the loan consolidation in August 2007, he spoke with XLS employees and "threatened to involve the authorities and sue the company for its fraudulent actions." (FAC at 6.) In November 2007, Ogunmokun notified the credit reporting agencies of the alleged fraud, and PHEAA introduced itself to him as the loan guarantor in February 2008. Construing this timeline in the light most favorable to Ogunmokun, and pegging his discovery of the violation to sometime in February 2008, Ogunmokun's FCRA claim expired, at the latest, in February 2010. Because Ogunmokun did not file the instant lawsuit until roughly two-and-a-half years later on August 31, 2012, his cause of action against CIT under the FCRA must be dismissed as time-barred.

## IV. Supplemental Jurisdiction Over Remaining State Law Claim

What remains, potentially, is Ogunmokun's state law claim that CIT aided and abetted fraud. The court notes, but does not decide, that this claim appears to survive the statute of limitations. [18] However, as no federal claims remain in this action, the Court declines to exercise its supplemental jurisdiction as to any remaining state law claims. This case is at the inception of litigation, and no discovery has yet to occur. Ogunmokun has raised a threshold question as to whether he should be entitled to limited fact discovery concerning the relationship between CIT and XLS to make a veil-piercing argument in support of his fraud claim against CIT. That question, too, potentially raises significant state law questions, including the applicability of New York's choice of laws statute.[19]

A court "may decline to exercise supplemental jurisdiction over a claim if [it] has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (citations and internal quotations omitted); *see One Commc'ns Corp. v. J.P. Morgan*

---

[18] Under New York law, the limitations period for an action sounding in fraud is "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8); Kottler v. Deutsche Bank AG, 607 F. Supp. 2d 447, 459 (S.D.N.Y. 2009) (applying six-year statute of limitations to both fraud and aiding and abetting fraud claims).

[19] Under New York's choice of law rules, "the law of the state of incorporation determines when the corporate form will be disregarded," *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995); *Capmark Financial Group Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335 (S.D.N.Y. 2013), and both CIT and XLS were/are Delaware corporations. (CIT's Mot. to Dism. at 5 n.2.) Thus, a New York court is best poised to address whether Delaware law or, as CIT maintains, New York law, governs any veil-piercing (and agency-related) analyses, (*id.* at 7–8), New York and Delaware veil-piercing law are largely equivalent. *See LaCourte v. JP Morgan Chase & Co.*, No 12-CV-9453 (JSR), 2013 WL 4830935, at *6 n.2 (S.D.N.Y. Sept. 4, 2013).

*SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims"); *Sullivan v. City of New York*, No. 10-CV-0038 (NRB), 2011 WL 3806006, at *6 (S.D.N.Y. Aug. 29, 2011) ("where federal claims are dismissed before trial, the state [claims] should be dismissed as well") (quoting *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir.1998)).  On balance, for the reasons discussed above, all of these factors decidedly tip in favor of declining to exercise supplemental jurisdiction over Ogunmokun's remaining state law claim.

**CONCLUSION**

Accordingly, the motion of defendant PHEAA (Doc. Nos. 74, 76) to dismiss Ogunmokun's Fifth Amended Complaint (Doc. No. 71) is hereby GRANTED in its entirety. The motion of defendant CIT (Doc. Nos. 78, 80) to dismiss the Fifth Amended Complaint is hereby GRANTED in part, insofar as dismissing Ogunmokun's claim against CIT under the FCRA. The Court declines to exercise supplemental jurisdiction over Ogunmokun's remaining state law claim against CIT.

The Clerk of Court is directed to enter the Judgment accordingly. The Clerk is further directed to mail a copy of this Memorandum and Order and the accompanying Judgment to *pro se* plaintiff Ogunmokun, and to note the mailing on the docket.

SO ORDERED.

*Roslynn R. Mauskopf*

Dated: Brooklyn, New York
　　　　September 23, 2014

_____
ROSLYNN R. MAUSKOPF
United States District Judge